**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **ELWOOD H. JONES, JR.** | : | |
| **c/o David F. Hine, Esq.** | : | |
| **Vorys, Sater, Seymour and Pease LLP** | : | |
| **301 E. 4th St., Suite 3500** | : | |
| **Cincinnati, OH 45202** | : | **CASE NO. 1:26-cv-730** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JUDGE** _____ |
| | : | |
| **THE CITY OF BLUE ASH** | : | |
| **4343 Cooper Road** | : | |
| **Blue Ash, OH 45242** | : | |
| | : | |
| **and** | : | |
| | : | |
| **OFFICER ROBERT S. LILLEY** | : | |
| **1707 Virginia Hill Road** | : | |
| **Rexford, MT 59930** | : | |
| | : | |
| **and** | : | |
| | : | |
| **OFFICER JAMES D. SCHAFFER** | : | |
| **8283 White Hill Lane** | : | |
| **West Chester, OH 45069** | : | |
| | : | |
| **and** | : | |
| | : | |
| **OFFICER JOHN D. LADD, JR.** | : | |
| **4116 Hoffman Ave.** | : | |
| **Cincinnati, OH 45236** | : | |
| | : | |
| **and** | : | |
| | : | |
| **LARRY J. STOKES, SR.** | : | |
| **P.O. Box 975** | : | |
| **Anna Maria, FL 34216** | : | |
| | : | |
| **and** | : | |

DANIEL S. NOONAN                    :
983 Crestpoint Ct.                     :
Cincinnati, OH 45245                :
  :
and                          :
  :
RONALD J. BOYATT               :
7440 Mar Del Drive               :
Cincinnati, OH 45243             :
  :
and                          :
  :
PAUL W. HARTINGER           :
6371 Prairie Ct.                   :
Liberty Township, OH 45044     :
  :
and                          :
  :
CHRIS D. WALLACE             :
6300 Plainfield Road             :
Cincinnati, OH 45213             :
  :
and                          :
  :
ROBERT J. STEWART           :
859 Spring Ave.                   :
The Villages, FL 34762           :
  :
and                          :
  :
JOHN AND JANE DOES 1 - 20.    :
  :
                **Defendants.**    :

---

## COMPLAINT AND JURY DEMAND

---

For his Complaint against Defendants the City of Blue Ash (the "City"), Officer Robert S. Lilley, Officer James D. Schaffer, and Officer John D. Ladd, Jr., Officer Larry J. Stokes, Officer Daniel S. Noonan, Officer Ronald J. Boyatt, Officer Paul W. Hartinger, Officer Chris D. Wallace,

2

Officer Robert J. Stewart and John and Jane Does 1-20[1] (collectively, "Defendants"), Elwood H. Jones, Jr. ("Mr. Jones") states as follows:

### INTRODUCTION

1.     Mr. Jones is an innocent man who spent nearly thirty years on death row for a murder he did not commit.

2.     Mr. Jones was convicted in November 1996 for the September 3, 1994, murder of Rhoda Nathan.  Mr. Jones's conviction was secured on the basis of Defendants' manufactured evidence, suppressed exculpatory materials, and junk science, and as a result of Defendants' police investigation being so fundamentally and irreparably corrupted by cognitive bias that a nationally recognized expert in police investigations and procedures, retained to review the investigation file in post-conviction proceedings, described it as among "the best examples of cognitive bias" she had encountered in nearly forty years of professional experience.

3.     That same expert concluded that the failures of the investigation resulted in "a likely perversion of justice" and testified that she would not have recommended indicting *anyone* on the basis of the investigation file she reviewed—let alone Mr. Jones.

4.     Ms. Nathan's murder was the first homicide to occur in Blue Ash, Ohio in at least fifteen years. Officers assigned to investigate the murder were inexperienced homicide investigators and inexperienced crime scene investigators.  Whether out of inexperience, lack of care, a failure to properly train or supervise officers, inadequate policies, or something more nefarious, Defendants allowed key evidence to be removed, contaminated, or destroyed, and they utterly failed to conduct a proper investigation.

---

[1]     Officers Lilly, Schaffer, Ladd, Stokes, Noonan, Boyatt, Hartinger, Wallace, and Stewart, and any unidentified officers of the Blue Ash Police Department ("BAPD") included amongst John and Jane Doe 1 - 20 are collectively referred to as the "BAPD Officers".

5.      Less than two weeks after the murder, before a complete investigation could have been conducted (one never was) and without any direct evidence tying Mr. Jones to the murder, Defendants began to fixate on Mr. Jones as their "perfect suspect."

6.      Once Defendants fixated on Mr. Jones, Defendants never seriously considered any alternate suspects or alternate theory of the crime.

7.      In fact, any evidence Defendants did have that was inconsistent with Mr. Jones's purported guilt was intentionally ignored, discounted, or suppressed, and when doing that was not enough, Defendants planted evidence to manufacture a basis to arrest Mr. Jones on September 27, 1995.

8.      Defendants' reckless disregard for justice and their unconstitutional acts in skewing the evidence against Mr. Jones resulted in his conviction and death sentence.

9.      Mr. Jones remained in the state's custody for 9,971 days, the overwhelming majority of which were spent awaiting his impending execution.

10.     After years of fighting for his innocence, in 2025, the State of Ohio (the "State") dismissed all charges against Mr. Jones with prejudice.

11.      The Hamilton County Prosecutor publicly addressed the dismissal stating: "I am not convinced that Mr. Jones killed Rhoda Nathan."  The State explicitly tied the dismissal to the failures of the original investigation, citing a lack of physical or forensic evidence linking Mr. Jones to the murder, insufficient follow-up on witness statements pointing to alternative suspects, medical testing that excluded Mr. Jones as a suspect, and the failure to disclose exculpatory evidence.

12.     The State thus confirmed what Mr. Jones had maintained for nearly thirty years: he is an innocent man who was wrongfully convicted as a direct result of Defendants' fundamentally flawed investigation.

13.     During his time on death row, Mr. Jones was scheduled to be executed six, separate times.  While Mr. Jones spent his days in a jail cell, facing execution and praying for someone to hear his cries of innocence, the world moved on without him.  Mr. Jones missed the births of grandchildren, nieces, and nephews.  He missed weddings, holidays, and the simple act of sharing meals with the people he loved.  Mr. Jones was absent as friends and family members—including his mother, father, and wife—were buried, unable to grieve alongside those who mourned.  He watched decades of his life dissolve behind prison walls—not because the evidence demanded it or because justice required it, but because Defendants withheld mountains of exculpatory evidence, ignored alternate suspects and a confession by another man, and chose to build a case against Mr. Jones rather than discover the truth.

14.     The constitutional violations in this action are numerous, severe, and independently sufficient to have caused Mr. Jones's wrongful conviction. When considered together, however, they are staggering.  Mr. Jones now seeks redress for these constitutional violations and the tortious conduct of Defendants that directly caused his wrongful conviction and wrongful imprisonment.

## JURISDICTION, VENUE, AND PARTIES

15.     The Court has jurisdiction over Mr. Jones's claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this action arises under 42 U.S.C. § 1983, 42 U.S.C. § 1985, 42 U.S.C. § 1986, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This Court has supplemental jurisdiction over Mr. Jones's state law claims pursuant to 28 U.S.C. § 1367.

16.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred in Hamilton County, Ohio, which lies within this District.

17.     Mr. Jones is an individual who resides in Hamilton County, Ohio.

18.     The City is a municipal corporation organized and existing under the laws of the State of Ohio, located in Hamilton County, Ohio. The City is responsible for the policies, practices, customs, and actions of the Blue Ash Police Department ("BAPD") and its employees and agents.

19.     The BAPD is the law enforcement agency of the City.  At all relevant times, the BAPD was responsible for the investigation of the September 3, 1994 murder of Ms. Nathan at the Embassy Suites Hotel in Blue Ash, Ohio, which gave rise to the wrongful arrest, prosecution, conviction, and imprisonment of Mr. Jones.

20.     Officer Robert S. Lilley was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan.  He is sued in both his individual and official capacities.  At all relevant times, Officer Lilley acted under color of state law.

21.     Officer James D. Schaeffer was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities.  At all relevant times, Officer Schaffer acted under color of state law.

22.     Officer John D. Ladd, Jr. was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities.  At all relevant times, Officer Ladd acted under color of state law.

23. Officer Larry J. Stokes, Sr. was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities. At all relevant times, Officer Stokes acted under color of state law.

24. Officer Daniel S. Noonan was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities. At all relevant times, Officer Noonan acted under color of state law.

25. Officer Ronald J. Boyatt was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities. At all relevant times, Officer Boyatt acted under color of state law.

26. Officer Paul W. Hartinger was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities. At all relevant times, Officer Hartinger acted under color of state law.

27. Officer Chris D. Wallace was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan. He is sued in both his individual and official capacities. At all relevant times, Officer Wallace acted under color of state law.

28. Officer Robert J. Stewart was, at all relevant times, a BAPD law enforcement officer employed by the City who played a role in the investigation of the murder of Ms. Nathan.

He is sued in both his individual and official capacities.  At all relevant times, Officer Stewart acted under color of state law.

29.     Defendants John and Jane Does 1 through 20 are unknown BAPD officers, supervisors, policymakers, and/or other agents of the City whose identities are not yet known but whose actions and/or omissions also caused or contributed to the deprivation of Mr. Jones's constitutional rights.  Mr. Jones reserves the right to amend this Complaint to identify them upon completion of reasonable discovery.

## FACTS

### *The Murder of Rhoda Nathan*

30.     On September 2, 1994, Ms. Nathan visited Cincinnati, Ohio from out of town.  She checked into room 237 at the Embassy Suites hotel in Blue Ash, Ohio.  She was sharing a room with her friends Elaine Schub and Joe Kaplan, who checked in earlier that day.

31.     On September 3, 1994, Ms. Nathan was found beaten and struggling for her life in room 237.

32.     Despite efforts to save her life, Ms. Nathan was pronounced dead later that day.

33.     In addition to the apparent murder, there was potential evidence that Ms. Nathan's room had been burglarized and it was reported that the perpetrator took items of jewelry and cash.

34.     Mr. Jones was employed at the Embassy Suites Hotel as a banquet employee and lead houseman at the time of the murder.

35.     Prior to the murder, Mr. Jones worked at the Embassy Suites for approximately two years.

36.     During his tenure at the hotel, Mr. Jones received promotions, positive performance reviews, and bonuses.

37. Ms. Nathan's was the first homicide to occur in Blue Ash, Ohio in at least fifteen years.

38. As a result, the officers assigned to investigate Ms. Nathan's murder were, by their own admission, inexperienced homicide investigators who had never previously worked a complex, stranger-homicide of this nature.

### Defendants' Failure to Secure and Process the Crime Scene

39. From the moment Defendants arrived on the scene to investigate Ms. Nathan's murder, they failed to secure, protect, and preserve the crime scene in accordance with even the most basic professional law enforcement standards.

40. Before Defendants secured the room, at least fifteen individuals were known to have entered the room, including persons offering medical assistance, a hotel chef, hotel staff, hotel guests, and other bystanders.

41. For example, Defendants' investigation file shows that a hotel maintenance employee entered the room and, while Ms. Nathan was still lying on the floor, went through the exterior door of the room onto the balcony to allegedly inspect the ground cover for signs of a fleeing suspect.

42. Notably, this same employee was later described as both nervous and suspicious by other witnesses.

43. Eventually, after being disturbed by a number of people (with no indication of whether those people took anything from the room), the room was ostensibly "secured" and a crime scene log was started.

44. Yet, even after the room was "secured," over 100 combined entries and exits to the room were recorded in just the first 24 hours following the murder. During that time almost thirty different individuals (including three civilians) entered the crime scene. The records show that

9

many of the officers who entered the scene, had no investigative role whatsoever and were essentially sightseeing.

45.     For example, the City's Chief of Police entered the room five times in the first 24 hours alone.

46.     The City's Chief of Police later acknowledged that he had nothing substantive to do with the investigation.  In fact, he admitted that he had no relevant crime scene investigation experience.

47.     There was no conceivable investigative justification for the Chief of Police to have tromped through the active crime scene five separate times.

48.     The same holds true for the other BAPD officers who entered the scene with no investigative purpose.

49.     In addition to unnecessary entries and exits from BAPD officers, both Ms. Schub and Mr. Kaplan were permitted to enter the active crime scene and retrieve their luggage, clothing, and other personal belongings.

50.     At that point, Ms. Schub and Mr. Kaplan could not have been (and were not) excluded as potential witnesses or even suspects.

51.     Moreover, the materials Ms. Schub and Mr. Kaplan took from the crime scene could not have been (and were not) excluded as evidence or sources of the same.  Indeed, there is no evidence that officers searched *any* of their belongings before allowing them to remove their property.

52.     In addition to failing to secure and limit access to the crime scene, Defendants failed to formulate any plan for the processing of the crime scene.

53.     Defendants did not divide tasks, conduct a grid search, a concentric circle search, or any other systematic search pattern. Instead, multiple BAPD Officers took photographs and collected fingerprints in an uncoordinated fashion, wandering through the crime scene without any systematic method.

54.     The unplanned and uncoordinated nature of the crime scene examination resulted in some portions of the crime scene being photographed multiple times from multiple angles, and other portions of the crime scene not being photographed at all.

55.     Defendants also failed by limiting the relevant crime scene *exclusively* to the interior of Room 237; Defendants did not rope off, secure, or preserve any of the areas adjacent to the room, including the hallways, elevators, stairwells, common areas, employee breakroom, or the exterior grounds and wooded area adjacent to the hotel.

56.     As a result, bloody footprints that were observed leading away from room 237 were not secured, and the areas in which they were found were not roped off.

57.     By the time Defendants eventually got around to acknowledging the footprints, they were smeared and destroyed before they could be properly documented.

58.     While eyewitnesses reported observing important activity outside of room 237, Defendants failed to rope off or preserve the stairwell and exit door; failed to collect the important physical evidence (such as a yellow plastic cup one witness noted had been used to prop open a door during the time of the murder, and which could have been examined for scientific evidence such as fingerprints and DNA); failed to search the field and adjacent wooded area for bloody footprints, footprint impressions, or discarded clothing or weapons; and failed to fingerprint the exit door.  None of these areas were secured, and dozens of people traversed these areas, permanently destroying any physical evidence that might have existed.

11

59. Defendants' failure to treat the entirety of the hotel and its adjacent grounds as a potentially relevant crime scene represents a profound failure of even the most basic crime scene investigation principles.

60. Defendants essentially proceeded as if the assailant vanished into thin air upon leaving room 237.

### *Defendants' Failure to Preserve Critical Evidence*

61. Defendants also knowingly disposed of, or gave away, key evidence connected to the crime.

62. After the murder, Ms. Schub reported that money was stolen from her purse, presumably by the assailant.

63. An examination of its contents, including fingerprint analysis of the wallet, driver's license, credit cards, and other items presumably touched by the assailant could have yielded critical identifying evidence.

64. Instead of collecting the purse as evidence, Defendants allowed the purse to be removed from the fresh crime scene on the day of the murder and returned to Ms. Schub, who was visiting from Florida.

65. Defendants eventually realized their error and contacted Ms. Schub, who by then was back in Florida, to request the purse be returned.

66. According to Defendant's investigation notes, Ms. Schub was "extremely reluctant" to return the purse, and when she ultimately did so she had already removed its most important contents.

67. By the time the purse was analyzed, it unsurprisingly yielded no relevant forensic evidence; heat, humidity, and continued handling had rendered it forensically useless.

12

68. Room 237 also contained towels used by Ms. Nathan, Ms. Schub and Mr. Kaplan.

69. It was reported that Ms. Nathan had showered the morning of the murder, and when she was found she was (or had recently been) wearing a towel.

70. Officers made no effort whatsoever to account for the number, source, condition, or location of the towels in Room 237, or to consider them for their potential evidentiary value. Instead, employees of the Embassy Suites said that Defendants allowed housekeeping to carry away bloody towels from Room 237 without seizing them as evidence.

71. Blood types were readily identifiable from biological samples in 1994. Failure to preserve these towels prevented samples from being taken.

72. Similarly, a bloody handprint was found on the room door, and possible bloody marks were observed on the curtains near the door. Defendants did not adequately document, collect, or analyze these items.

### *Defendants' Fixation on Mr. Jones as The Suspect and Exclusion of Any Evidence to the Contrary*

73. Defendant's errors continued in the days after the crime, as they rapidly and prematurely fixated on Mr. Jones as the sole suspect.

74. Eight days after the murder, on September 11, 1994, internal BAPD reports referred to Mr. Jones as "the suspect" and "the target."

75. On September 15, 1994, Defendants told the Embassy Suites that Mr. Jones "is our suspect."

76. That same day, the Hamilton County Prosecutor who assisted with the investigation deemed Mr. Jones "the perfect suspect."

77.     The consequences of the Defendants' tunnel vision identifying Mr. Jones as the only suspect eight days into investigating pervade every single aspect of the investigation that followed.

### Defendants' Failure to Investigate Viable Alternative Suspects

78.     Defendants' rabid focus on Mr. Jones caused it to fail to adequately investigate several alternative suspects who had far more significant and plausible connections to the crime than Mr. Jones.

79.     For example, the investigation file establishes that Defendants learned of an Embassy Suites employee with a serious criminal record, including aggravated robbery, carrying a concealed weapon, theft, and tampering with records.

80.     On the day of the murder, this employee was seen at the hotel even though he was not scheduled to work.

81.     BAPD officers who interviewed him noted he was extremely nervous and was bordering on hyperventilating, and that he specifically asked Defendants if Ms. Nathan had identified her assailant.

82.     Even though that same Embassy Suites employee reportedly sought medical attention for a mysterious shoulder injury later the same day of the murder, was reportedly flush with cash that night, and offered only a biased alibi who admitted to being untruthful, Defendants did nothing to follow up with this employee whatsoever after he was deemed to have "passed" a brief polygraph test.

83.     Eyewitnesses also identified outside contractors working at the hotel, such as plumbers and drywall workers who had unique access to tools that could have been used to create the bruising discovered on Ms. Nathan's body, and who were observed "sneaking" around the

14

hotel at times when they no longer had a reason to be present. Defendants did nothing to investigate these suspects.

84. One eyewitness observed a white male sprinting out of the hotel through a side exit propped open with a yellow plastic cup, approximately ten minutes before Mrs. Nathan's body was discovered.

85. That witness reported to Defendants her observations the same day as the murder, and then confirmed her account in a subsequent telephone call with a BAPD officer.

86. Mr. Jones, of course, is a Black male. Thus, the white male suspect identified did not match Mr. Jones. Nevertheless, Defendants never followed up with this eyewitness regarding what she saw or did anything to investigate the information she provided.

87. Defendants never collected the yellow plastic cup.

88. At the time of the murder, the Embassy Suites was also employing dozens of employees with criminal records ranging from petty theft to serious assault. One such employee quit his job and left town immediately after the murder, leaving behind an $800 paycheck he never picked up.

89. In addition to the foregoing, there were countless other viable suspects and potential leads, with dozens of hotel employees, hundreds of hotel guests, and an unknown number of people in the hotel that day who did not fit into either category.

90. Defendants did nothing to investigate any of these leads or suspects.

91. Defendants failed to confirm alibis for, fingerprint, or seriously investigate the vast majority of these individuals. In most cases, Defendants did not even interview them in connection with the murder.

92. Instead, Defendants focused their attention exclusively on Mr. Jones.

93. Defendants also operated under the unfounded assumption that only male suspects needed to be investigated. Despite the fact that Mrs. Nathan was a short, elderly woman who could have been overpowered by a female assailant, and despite the fact that several female hotel employees had significant criminal records, Defendants effectively eliminated all female suspects at the outset of the investigation.

### *Defendants' Suspicious Purported Discovery of a Pendant in Mr. Jones's Car*

94. Defendants took Mr. Jones's vehicle into possession on September 12, 1994.

95. Defendants evidence log shows that the vehicle sat unmonitored at the BAPD garage for the entirety of September 13, 1994.

96. On September 14, 1994, the car was towed to the Hamilton County Coroner's Office for inspection.

97. During this time, Mr. Jones's vehicle was subjected to an exhaustive, several-hour forensic examination at the Coroner's Office by multiple investigators working together, specifically looking for evidence connecting Mr. Jones to the murder.

98. The search of Mr. Jones's vehicle was conducted in two phases: first, a thorough forensic examination for blood, fibers, and other trace evidence, followed by a systematic search for items of evidentiary value.

99. Multiple officers participated in both phases of this search.

100. At the conclusion of the search, BAPD records indicate that nothing of evidentiary value was discovered in Mr. Jones's car.

101. Yet, during Mr. Jones's trial in 1996, BAPD officer Michael Bray testified that later in the same day Mr. Jones's vehicle was exhaustively searched by multiple trained investigators,

16

he decided to search Mr. Jones's vehicle a second time—alone—and allegedly discovered a pendant in a toolbox that was in Mr. Jones's vehicle.

102. The pendant was presented to the jury as the single most powerful piece of physical evidence linking Mr. Jones to the murder. It was described to the jury as a unique, one-of-a-kind piece of jewelry, worn by Ms. Nathan, made from a Nathan-family heirloom, and found in Mr. Jones's toolbox. The State returned to it again and again throughout trial. At one point, the State described the pendant as so unique it was akin to a fingerprint.

103. However, the evidence surrounding the pendant's alleged discovery, including who found it, when it was found, how it was handled, and what Defendants knew about its origins, is so riddled with inconsistency, implausibility, and internal contradiction that the most reasonable inference is that the pendant was never found in Mr. Jones's toolbox at all.

104. To begin with, there is nothing in the hundreds of pages of Defendants' investigation file in which a BAPD officer identifies themselves as the person who found the pendant in Mr. Jones's toolbox.

105. Officer Bray's investigative reports throughout the file are otherwise complete and detailed, covering every aspect of the investigation including his personal opinions and conclusions. In his notes and written correspondence, Officer Bray used consistently personal and possessive language to describe his contributions to the investigation. Yet, in the report referring to the pendant, he conspicuously depersonalized his language, writing: "the pendant necklace which was recovered in [Mr.] Jones' car."

106. Further, Officer Bray testified at Mr. Jones's trial that he allegedly found the pendant.

17

107. Yet, other investigation files indicate that it was Officer Schaffer—not Officer Bray—who found the pendant.

108. Officer Lilley testified that he did not know whether a written report was even made and suggested that maybe he was told verbally that Officer Bray found the pendant.

109. To date, there is no clear written record of Defendants detailing who found the pendant and how.

110. The evidence log detailing the chain of custody for the pendant is also problematic. For example, after the pendant was allegedly found, it was then transported to New York by Defendants and returned, but was never re-booked into evidence upon its return.

111. Further, Defendants' investigative notes indicate that, while in New York, Ms. Nathan's family refuted the suggestion that the pendant was even Ms. Nathan's, and were provided with evidence that Ms. Nathan's pendant was not crafted from a family heirloom as initially believed. Those notes, of course, were withheld from Mr. Jones until after he was sentenced to death.

112. Defendants have never been able to provide a satisfactory explanation for any of these irregularities surrounding arguably the most important piece of evidence in Mr. Jones's conviction.

### *Defendants' Suppression of Mountains of Exculpatory Evidence*

113. While Defendants' gross mishandling of the investigation and potential fabrication of key evidence is tragic, their most consequential failure was their systematic suppression of thousands of pages of investigative materials from Mr. Jones and his defense team before trial.

114. Defendants suppressed witness statements, investigative notes, and other materials identifying a number of credible alternative suspects. The suppressed evidence included, *inter*

18

*alia*, information related to the hotel employee who was at the property on the day of the murder when he was not scheduled to work and who asked whether the victim could identify her assailant; a plumber with a violent criminal record who was seen "sneaking around" the hotel at the time of the murder and whose alibi was never verified; the former employee who quit and fled town in the immediate aftermath of the murder leaving behind an $800 paycheck; and an individual who, according to a tip received by the BAPD before trial, had confessed to committing the murder and to framing a Black man for his crime.  None of this information was disclosed to Mr. Jones before trial.

115.    A centerpiece of the theory against Mr. Jones at trial was that the murderer must have possessed a master key, and that only specific employees (including Mr. Jones) had access to such keys.  Defendants, however, suppressed extensive evidence that directly undermined this theory, including the statements of the hotel's security officer that master keys were routinely lost, stolen, and unaccounted for; that he had personally found 15–17 master keys on housekeeping carts; and that a hotel kitchen employee told investigators "you'd be surprised how many kitchen people have master keys."  Defendants also suppressed the admission of a critical hotel employee that he had "no idea" how many master keys were in circulation, while using only those portions of his statement that supported the master key theory.

116.    The State presented the dislodging of one of Ms. Nathan's teeth as evidence of the brutality of the attack and as the mechanism by which bacteria from her mouth allegedly entered a wound on Mr. Jones's hand.  However, Defendants suppressed interview notes from nurses who responded to the scene documenting that one of the nurses acknowledged she may have pulled out Mrs. Nathan's tooth during intubation because it was interfering with the procedure. Defendants never investigated this alternative explanation and never disclosed it to the defense.

117. Defendants suppressed a myriad of witness statements from hotel employees and guests regarding potential alternate suspects. For example, the statements of two hotel employees (who were familiar with Mr. Jones) independently reported observing a Black male and a white male together leaving Ms. Nathan's room on the morning of the murder—neither of which described the individuals as Mr. Jones. In another statement, a hotel guest stated she observed a white male sprinting out of a side exit of the hotel and continuing to run through an adjacent field and into the woods shortly before the Ms. Nathan was discovered.

118. Likely realizing it failed to conduct proper interviews of hotel guests during the initial investigation, Defendants later distributed written questionnaires to hotel guests present at the time of the murder. Defendants received over 400 pages of responses containing descriptions of suspicious individuals, attempted room intrusions, security breaches (including one specifically involving Ms. Nathan's room), and other information material to the investigation. Defendants did not conduct *any* follow-up investigation on a single questionnaire because they had already zeroed in on Mr. Jones by the time responses were received. Defendants also did not disclose a single page of the questionnaires to Mr. Jones prior to trial.

119. Defendants suppressed two medical test results that, together, effectively disprove the State's theory of the crime as a matter of objective science. First, Defendants suppressed evidence that Ms. Nathan had tested positive for Hepatitis B—a highly contagious blood-borne pathogen. Second, Defendants suppressed evidence that Mr. Jones had tested negative for Hepatitis B twelve days after the murder. An independent infectious disease expert testified at the post-conviction hearing that, given the bloody crime scene and the alleged open wound on Mr. Jones's hand, Mr. Jones would have contracted Hepatitis B if the State's theory of the crime were true. The fact that he did not—and, as more recent tests reveal, has never even been exposed to the

virus—scientifically undermines and effectively disproves the State's entire theory of the case. Yet, Mr. Jones had no knowledge of, or access to, this critical evidence before his trial.

120. The State repeatedly told the jury that the pendant recovered from Mr. Jones's vehicle was "unique," "one of a kind," and made from a family heirloom. These representations were central to its theory that Mr. Jones had stolen it from Ms. Nathan's room. Yet, Defendants suppressed their own investigative notes documenting that Mr. Nathan's son initially denied the pendant was even his mother's and described his mother's pendant in terms "completely different" from the one recovered. They also suppressed their own investigative notes documenting that Ms. Nathan's brother-in-law told investigators the pendant was not custom-made from an heirloom (he still had the suspected heirloom in his possession), but had instead been purchased from a commercial jewelry store in the Bronx.

121. In addition, prior to Mr. Jones's trial, a woman contacted Defendants and reported that another man, Earl Reed, had apparently confessed to committing the murder at the Embassy Suites and to framing a Black man for his crime. Defendants did not follow up on this information, document it, or disclose it to Mr. Jones. Instead, Defendants told the caller it was "a closed case" and took no further investigative action.

122. The foregoing evidence, and countless other documents intentionally suppressed by Defendants, was favorable to Mr. Jones.

123. The evidence was either directly exculpatory or could have been used by Mr. Jones to impeach the State's witnesses and theory.

124. If Mr. Jones had access to this information prior to his trial, he would never have been convicted. Indeed, if Defendants had properly considered the evidence in its own files, Mr. Jones never would have been charged.

21

***Defendants' Creation of a False Scientific Narrative Against Mr. Jones***

125. The day of Ms. Nathan's murder, Mr. Jones suffered an injury to his hand when throwing trash in an Embassy Suites dumpster (one of his job duties). The cut ultimately became infected and required surgery and antibiotics to heal.

126. Central to the case against Mr. Jones was the theory that he apparently injured his hand by punching Ms. Nathan in the mouth during a fatal beating.

127. The State deemed the injury to be a so-called "fight bite."

128. This theory was not the product of objective scientific analysis. Instead, it was constructed by Defendants through the selective use of medical evidence, the suppression of contradictory scientific findings, the mischaracterization of Mr. Jones's own statements, and the presentation of false expert testimony at trial.

129. Mr. Jones voluntarily explained the injury to Defendants on September 12, 1994, during a recorded interview. He stated clearly and consistently that he had hurt his hand twice that day: once when he slipped and fell on the stairs near a dumpster, cutting his hand, and once later that day when he reinjured it while assembling a portable dance floor as part of his banquet duties.

130. Mr. Jones informed Defendants there were no witnesses to either injury.

131. Defendants disregarded Mr. Jones's explanation entirely.

132. Instead, Defendants determined that Mr. Jones had fabricated inconsistent stories about the injury's origin. Defendants based this determination solely on workers' compensation forms Mr. Jones submitted for the injury wherein he said that employees at the Embassy Suites saw his hand ***after*** it was injured.

133.    Mr. Jones submitted the workplace compensation documentation to verify that a workplace injury occurred.  This was not submitted as part of the homicide investigation. Defendants, nevertheless, distorted their interpretation of the form to fabricate an "inconsistency."

134.    Because the injury became infected, on September 6, 1994, Mr. Jones was treated at a hospital for the infection in his hand.  Lab cultures returned results showing "Moderate probable Eikenella" and, in a separate report, "Mod Eik? [Smells like bleach]."

135.    Eikenella corrodens originates naturally within the human body.  It is a normal inhabitant of human mucosal surfaces, primarily living in the oral cavity (mouth and nasopharynx), as well as the gastrointestinal and urogenital tracts.  Because it is part of a body's natural flora, it usually coexists harmlessly with other bacteria.  However, it acts as an opportunistic pathogen, meaning it can cause or exacerbate infections in specific scenarios, for example when introduced into a wound.  Eikenella corrodens can be introduced into a wound through contact with soil, contaminated surfaces, or any environment where the bacterium is present—a punch to the mouth is only one of many possible mechanisms.

136.    Defendants obtained a search warrant for Mr. Jones's medical records on September 12, 1994, and seized those records.

137.    On September 16, 1994, a BAPD officer asked the pathologist whether the Eikenella bacterium was "unique to our victim." The pathologist said no — the bacterium is found in everyone's mouth and is not specific to any individual.  This answer should have prompted the Defendants to question whether the bacterium could have been introduced through a mechanism other than a punch to a mouth.

138.    Instead, Defendants abandoned this line of inquiry entirely. No culture was ever taken from Ms. Nathan's mouth for comparison, and no further testing was ever conducted.

23

139. At trial, Defendants' biased investigation provided the foundation for the testimony of the State's expert witness, Dr. John McDonough (a hand surgeon with no training in infectious diseases) who opined on the basis of extremely limited anecdotal experience alone that the Eikenella infection in Mr. Jones's hand could only have resulted from a "fight bite."

### *Defendants' False Testimony at Mr. Jones's Trial*

140. After failing to disclose exculpatory evidence to Mr. Jones before trial, Defendants compounded their offenses by repeatedly making false and misleading representations to Mr. Jones's defense team, to the Court, and to the jury throughout the pre-trial, trial, and post-conviction proceedings.

141. For example, BAPD officers testified—or offered statements used in argument—that all hotel employees had been questioned and none had seen anything unusual; all potential suspects had been investigated and their alibis had been confirmed; the murderer must have been issued a master key; the pendant was "unique" and "one of a kind" and made from a family heirloom; and Mr. Jones's hand infection was caused by a "fight bite" sustained while punching Mrs. Nathan in the mouth.

142. A simple review of the full BAPD file reveals each of these material representations were false.

143. If Defendants and its officers had testified truthfully at trial, Mr. Jones would never have been convicted.

### *Mr. Jones's Nearly Thirty-Year Fight for His Life*

144. On September 27, 1995 (more than a year after Defendants allegedly discovered Ms. Nathan's pendant in Mr. Jones's vehicle), Mr. Jones was arrested for Ms. Nathan's murder.

145. Mr. Jones was subsequently tried and, on November 26, 1996, was convicted of one count of aggravated murder, one count of aggravated burglary and one count aggravated robbery.

146. On January 9, 1997, Mr. Jones was sentenced to death.

147. For nearly three decades, Mr. Jones maintained his innocence and fought every day of his life to clear his name, all the while careening towards six different execution dates.

148. After his conviction, while fighting for his innocence, Mr. Jones eventually obtained access to evidence Defendants had suppressed before his trial.

149. Although some of that evidence came from the BAPD or other representatives of the State in formal proceedings, some of it did not.  For example, the BAPD never disclosed the fact that it received a call reporting another man's confession; that information came through an email that Mr. Jones received while in prison.

150. With the benefit of all the evidence (or at least all the evidence Defendants had collected), Mr. Jones filed a motion for new trial.

151. After a three-day evidentiary hearing in August 2022 in which the City and Officer Lilley participated and offered testimony, the Hamilton County Court of Common Pleas granted Mr. Jones a new trial, finding that material exculpatory evidence had been suppressed.

152. Among other things, the Court found that "the police investigation of the murder of Ms. Rhoda Nathan was mishandled by the Blue Ash Police Department in 1994;" that "the mishandling resulted in the jury considering evidence based on an incomplete police investigation and flawed circumstantial evidence;" that "the jury did not have the benefit of considering material evidence which was known to the BAPD and the State prior to trial but not disclosed to" Mr. Jones and his team; that the failure to disclose evidence "had effectively precluded [Mr.] Jones from

25

learning of the existence of that evidence and of the proposed grounds for a new trial until his defense team's post-conviction diligence;" and that "it is clear that the failure to disclose the existence of relevant exculpatory and impeaching evidence prior to trial deprived Elwood Jones of a fair trial."

153. Three years later, the State dismissed all charges against Mr. Jones with prejudice.

154. Mr. Jones had spent nearly thirty years wrongfully imprisoned, the majority of which was on death row awaiting execution for a crime he did not commit. He now seeks redress for the constitutional violations and tortious conduct of Defendants that caused his wrongful conviction and wrongful imprisonment.

### Count I: 42 U.S.C. § 1983 — Suppression of Exculpatory Material
### (Fourteenth Amendment — *Brady v. Maryland*)
### (Against All Defendants)

155. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

156. Defendants, acting individually and in conspiracy with each other, destroyed, failed to disclose, and otherwise withheld and/or suppressed exculpatory information and material from Mr. Jones, including but not limited to: hundreds of pages of investigative materials, which included numerous witness statements and over 400 guest questionnaire responses, information contradicting the provenance and identification of the pendant, and records identifying multiple alternate suspects; a call regarding Earl Reed's confession; and scientifically exculpatory Hepatitis B test results.

157. As a result of these violations, Mr. Jones was deprived of his right to a fair trial and was falsely convicted and sentenced to death for a crime of which he was innocent.

158. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

26

159.    The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers in their constitutional disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and the maintenance of a custom or practice of suppressing exculpatory evidence.

160.    The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

161.    Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

**Count II: 42 U.S.C. § 1983 — Impermissibly Suggestive Identification**
**(Fourteenth Amendment — Due Process)**
**(Against All Defendants)**

162.    Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

163.    Defendants, acting individually and in conspiracy with each other, employed impermissibly suggestive identification procedures that created a substantial likelihood of irreparable misidentification, in violation of the Due Process Clause of the Fourteenth Amendment.

164.    For example, when the pendant purportedly recovered from Mr. Jones's vehicle was presented to Ms. Nathan's son for identification, he affirmatively denied that the pendant was his mother's, stating that his mother's pendant was silver, not gold, and was of a different shape. Rather than accepting this denial as exculpatory evidence, Defendants showed Ms. Nathan's son a photograph of his mother wearing a similar item, after which he reversed his identification.

165. This procedure was impermissibly suggestive because Defendants introduced confirmatory information calculated to cause the witness to conform his identification to the investigators' predetermined theory.

166. Defendants further compounded the suggestive procedure by suppressing Ms. Nathan's son's initial denial and by suppressing the statement of the Ms. Nathan's brother-in-law who informed Defendants that the pendant was not custom-made and had been purchased from a jewelry store in the Bronx. The false representations that the pendant was "unique," "one of a kind," and fabricated from a family heirloom were repeated at trial as established fact.

167. This suggestive identification procedure was consistent with Defendants' broader pattern of manipulating evidence to conform to their predetermined theory.

168. As a result of these violations, Mr. Jones was deprived of his right to a fair trial and was wrongly convicted of a crime of which he was innocent.

169. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

170. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

171. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

172. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

## Count III: 42 U.S.C. § 1983 — Fabrication of Evidence
### (Fourteenth Amendment — Substantive Due Process)
### (Against All Defendants)

173. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

174. Defendants, acting individually and in conspiracy with each other, fabricated evidence that was used to secure Mr. Jones's wrongful conviction, including without limitation the false representations made during Mr. Jones's trial as set forth herein.

175. As a result of these violations, Mr. Jones was deprived of his right to a fair trial and was falsely convicted of a crime of which he was innocent.

176. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

177. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

178. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

179. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

## Count IV: 42 U.S.C. § 1983 — Destruction of Exculpatory Evidence
### (Fourteenth Amendment)
### (Against All Defendants)

180. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

29

181.    Defendants, acting individually and in conspiracy with each other, destroyed, failed to preserve, or permitted the destruction of material, potentially exculpatory evidence, in bad faith or with reckless disregard for Mr. Jones's constitutional rights.

182.    The destroyed or unpreserved evidence included, but was not limited to:

- Bloody towels recovered from room 237 that may have contained the killer's blood, which were returned to hotel housekeeping staff and discarded without examination;

- A yellow plastic cup used to prop open a stairwell exit door through which an eyewitness observed a male suspect fleeing the hotel, which was never collected or fingerprinted;

- Bloody footprints in hallways and common areas leading away from room 237, which were not secured and were destroyed by uncontrolled foot traffic;

- The stairwell exit door, which was never fingerprinted or examined for blood;

- Ms. Schub's purse, which was removed from the active crime scene and returned to Ms. Schub without being fingerprinted or examined;

- Unknown fingerprints recovered from the crime scene that did not match Mr. Jones and were never compared against any alternative suspect; and

- The crime scene outside room 237, including methods of egress, the elevator, the employee break room, and adjacent common areas, which were never secured or processed for evidence.

183. As a result of these violations, Mr. Jones was deprived of his right to a fair trial, his right to present a complete defense, and was wrongly convicted of a crime of which he was innocent.

184. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

185. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

186. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

187. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count V: 42 U.S.C. § 1983 — Malicious Prosecution
### (Fourth and Fourteenth Amendments)
### (Against All Defendants)

188. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

189. Defendants, acting individually and in conspiracy with each other, instigated and continued the prosecution of Mr. Jones without probable cause and acting out of malice. Defendants initiated criminal proceedings against Mr. Jones based on an investigation pervaded by cognitive bias, fabricated evidence, and the systematic suppression of exculpatory material, and continued to pursue his prosecution despite the absence of credible evidence of his guilt and in the face of substantial evidence pointing to his innocence.

190. The criminal proceedings terminated in Mr. Jones's favor when all charges were dismissed with prejudice in December 2025.

191. As a result of the malicious prosecution, Mr. Jones was falsely convicted and sentenced to death for a crime of which he was innocent, and was incarcerated for nearly thirty years.

192. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

193. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

194. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

195. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count VI: 42 U.S.C. § 1983 — Civil Conspiracy
### (Against All Defendants)

196. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

197. Defendants reached an agreement among themselves to deprive Mr. Jones of his constitutional rights as described herein.  In furtherance of this conspiracy, Defendants committed the overt acts described herein, including the suppression of exculpatory evidence, the fabrication of evidence, the manipulation of identification procedures, the destruction of potentially exculpatory evidence, and the malicious prosecution of Mr. Jones.

198.    As a result of this conspiracy, Mr. Jones was deprived of his constitutional rights, was falsely convicted and sentenced to death, and was imprisoned for nearly thirty years.

199.    The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

200.    The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

201.    The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

202.    Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count VII: 42 U.S.C. § 1983 — Monell Municipal Liability
### (Against the City)

203.    Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

204.    The City, acting through the BAPD and its policymakers, maintained and enforced policies, customs, and practices that were the moving force behind the constitutional violations described herein, including but not limited to:

- A failure to train BAPD officers in their constitutional obligations under *Brady v. Maryland* and its progeny, including the obligation to identify, preserve, and disclose exculpatory and impeachment evidence to the defense;

- A failure to train BAPD officers in proper homicide investigation procedures, crime scene management, and evidence preservation, despite the fact that the BAPD had

33

not investigated a homicide in at least fifteen years and its officers were inexperienced in complex criminal investigations;

- A failure to implement safeguards against investigative cognitive bias, confirmation bias, tunnel vision, and groupthink, all of which pervaded the investigation of Ms. Nathan's murder;

- A custom or practice of suppressing and withholding exculpatory evidence from criminal defendants;

- A custom or practice of prematurely fixating on a single suspect and thereafter ignoring, discrediting, or suppressing evidence pointing to alternative suspects or theories of the crime;

- A custom or practice of manipulating forensic evidence and identification procedures to conform to investigators' predetermined theories; and

- Ratification of the BAPD's unconstitutional conduct by supervisory officials, including the Chief of Police, who was personally present at the crime scene on five occasions within the first 24 hours, took no corrective action, and permitted the investigation to proceed in the constitutionally deficient manner described herein.

205. The City's deliberate indifference to the constitutional rights of persons subject to investigation by the BAPD was the moving force behind Mr. Jones's wrongful conviction and imprisonment.

206. The misconduct described in this Count was undertaken by the City with malice, bad faith, and in a wanton and reckless manner.

207. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

34

### Count VIII: 42 U.S.C. § 1985 — Conspiracy to Interfere with Civil Rights
### (Against All Defendants)

208.    Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

209.    Defendants reached an agreement among themselves to deprive Mr. Jones of his civil rights as described herein.  In furtherance of this conspiracy, Defendants committed the overt acts described herein, including the suppression of exculpatory evidence, the fabrication of evidence, the manipulation of identification procedures, the destruction of potentially exculpatory evidence, and the malicious prosecution of Mr. Jones.

210.    As a result of this conspiracy, Mr. Jones was deprived of his civil rights, was falsely convicted and sentenced to death, and was imprisoned for nearly thirty years.

211.    The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

212.    The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

213.    The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

214.    Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count IX: 42 U.S.C. § 1986 — Action for Neglect to Prevent
### (Against All Defendants)

215.    Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

216. Defendants reached an agreement among themselves to deprive Mr. Jones of his civil rights as described herein. In furtherance of this conspiracy, Defendants committed the overt acts described herein, including the suppression of exculpatory evidence, the fabrication of evidence, the manipulation of identification procedures, the destruction of potentially exculpatory evidence, and the malicious prosecution of Mr. Jones.

217. As a result of this conspiracy, Mr. Jones was deprived of his civil rights, was falsely convicted and sentenced to death, and was imprisoned for nearly thirty years.

218. The BAPD Officers were acting under color of law and within the scope of their employment when they took these acts.

219. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

220. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

221. Defendants had the power to prevent Mr. Jones's wrongful imprisonment.

222. Defendants, knowing Mr. Jones's was innocent refused to take any action to prevent Mr. Jones's wrongful imprisonment.

223. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count X: Ohio Revised Code § 2921.45 — Deprivation of Civil Rights
### (Against All Defendants)

224. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

225. The BAPD Officers, acting under color of their official authority as law enforcement officers of the City, knowingly deprived Mr. Jones of his constitutional rights, privileges, and immunities, in violation of Ohio Revised Code § 2921.45.

226. As a result, Mr. Jones was wrongly convicted, sentenced to death, and imprisoned for nearly thirty years.

227. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

228. The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

229. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

230. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count XI: Ohio Constitution, Article I, Sections 10 and 14
### (Against All Defendants)

231. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

232. The BAPD Officers, acting under color of their official authority as law enforcement officers of the City, violated Mr. Jones's rights under Article I, Section 10 (right to a fair trial and due process of law) and Article I, Section 14 (protection against unreasonable searches and seizures) of the Ohio Constitution.

233. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the

37

City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

234. The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

235. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

236. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count XII: Ohio State Law — Malicious Prosecution
### (Against All Defendants)

237. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

238. Defendants, acting individually and in conspiracy with each other, instigated and continued the prosecution of Mr. Jones without probable cause and acting out of malice.

239. The criminal proceedings terminated in Mr. Jones's favor when all charges were dismissed with prejudice.

240. As a result of the malicious prosecution, Mr. Jones was falsely convicted of a crime of which he was innocent.

241. The BAPD Officers were acting within the scope of their employment when they took these acts.

242. The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

243.    The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

244.    The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

245.    Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count XIII: Ohio State Law — Intentional Infliction of Emotional Distress
### (Against All Defendants)

246.    Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

247.    Defendants, acting individually and in conspiracy with each other, intentionally and/or recklessly engaged in extreme and outrageous conduct that caused Mr. Jones severe emotional distress and bodily harm.

248.    Defendants' conduct—including the fabrication and suppression of evidence, the manipulation of identification procedures, the destruction of exculpatory evidence, and the malicious prosecution of Mr. Jones resulting in a death sentence and nearly thirty years of wrongful imprisonment—was so extreme and outrageous as to go beyond all possible bounds of decency and was utterly intolerable in a civilized community.

249.    The BAPD Officers were acting within the scope of their employment when they took these acts.

250.    The City is also liable because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

251.     The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

252.     The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

253.     Mr. Jones suffered actual damages, severe emotional distress, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count XIV: Ohio State Law — Civil Conspiracy
### (Against All Defendants)

254.     Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

255.     Defendants formed a conspiracy and reached a common understanding or agreement to accomplish an unlawful objective by unlawful means, specifically the wrongful conviction and imprisonment of Mr. Jones through the suppression and fabrication of evidence, the manipulation of identification procedures, and the malicious prosecution of Mr. Jones.

256.     In furtherance of this conspiracy, Defendants committed the overt acts described throughout this Complaint.

257.     As a direct and proximate result of this conspiracy, Mr. Jones was wrongfully convicted, sentenced to death, and imprisoned for nearly thirty years.

258.     The BAPD Officers were acting within the scope of their employment when they took these acts.

259.     The City is also because the violation of Mr. Jones's rights described in this Count was caused by the policies, practices, customs, and/or the decisions of policymakers for the City, including the failure to train and supervise BAPD officers, and the maintenance of improper customs and practices.

260. The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

261. The misconduct described in this Count was undertaken by Defendants with malice, bad faith, and in a wanton and reckless manner.

262. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

### Count XV:  Ohio State Law — Spoliation of Evidence
### (Against All Defendants)

263. Mr. Jones incorporates every paragraph in this Complaint as if fully set forth here.

264. Defendants willfully destroyed or permitted the destruction of evidence relevant to Mr. Jones's criminal proceedings, knowing that there was pending or probable litigation that would involve such evidence.  The destroyed evidence included but was not limited to: bloody towels from Room 237; the yellow plastic cup from the stairwell exit; bloody footprints in common areas; Elaine Schub's purse and its contents; and physical evidence at the crime scene that was compromised by the failure to secure methods of egress and by the more than 100 entries and exits to the room in the first 24 hours.

265. As a result of the absence of this evidence, Mr. Jones was deprived of his right to present a complete defense and was falsely convicted of a crime of which he was innocent.

266. The BAPD Officers were acting within the scope of their employment when they took these acts.

267. The City is also liable for the conduct of its employees under the doctrine of *respondeat superior.*

268. Mr. Jones suffered actual damages, pain and suffering, loss of liberty, lost wages, and other damages as a direct and proximate result.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Elwood H. Jones, Jr. respectfully requests that this Court enter judgment in his favor and against all Defendants, awarding:

(a)    Compensatory damages in an amount to be determined at trial, including damages for loss of liberty, physical suffering, severe emotional distress, mental anguish, loss of enjoyment of life, loss of earning capacity, damage to reputation, loss of familial relationships, and all other harms suffered as a result of Defendants' unconstitutional conduct;

(b)    Punitive damages against each of the Defendants in their individual capacities in an amount sufficient to punish and deter future misconduct;

(c)    Attorneys' fees, expert fees, and all other costs recoverable pursuant to 42 U.S.C. § 1988;

(d)    Pre-judgment and post-judgment interest as allowed by law;

(f)    Such other and further relief as this Court deems just and proper.

*/s/ David F. Hine*
David F. Hine (0085568)
Emily E. St. Cyr (0092301)
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Phone/Fax: (513) 723-4078
dfhine@vorys.om
eestcyr@vorys.com

Ravert J. Clark (0042027)
2115 Luray Ave.
Cincinnati, OH 45206
Phone: (513) 587-2887
notguilty14@aol.com

*Counsel for Plaintiff Elwood H. Jones, Jr.*

42

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Elwood H. Jones, Jr. hereby demands a jury trial on all issues so triable.

*/s/ David F. Hine*
David F. Hine